Joshua A. Altman (CA Bar No. 259565)
JACOBS & SCHLESINGER LLP
1620 Fifth Avenue, Suite 750
San Diego, CA  92101
Tel: (619) 230-0012
Fax: (619) 230-0044
josh@jsslegal.com

Attorney for Petitioner

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SATBAY KYDYRALI,<br><br>Petitioner,<br><br>v.<br><br>CHAD F. WOLF et al,<br><br>Respondents. | Case No.: 3:20-cv-00539-AJB-AGS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING SECOND MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>[Notice of Motion and Second Motion for Temporary Restraining Order and Declaration filed concurrently.] |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

I.      INTRODUCTION. ............................................................................1

II.     FACTUAL BACKGROUND. ..........................................................3

        A.      Kydyrali's Prolonged Detention .........................................3

        B.      COVID-19 Dangers at OMDC ............................................5

                1.      COVID-19 Dangers in Detention Facilities ...............5

                2.      Minimum Steps Necessary to Protect Civil Detainees from
                        COVID-19 ...................................................................8

                3.      COVID-19 Cases at OMDC .......................................12

                4.      Conditions at OMDC .................................................13

                        i.       Hand Sanitizer Availability .............................13

                        ii.      Cleaning Supplies, Crews, and Schedule .........14

                        iii.     Personal Protective Equipment .......................15

                        iv.      Screening, Quarantining, and Treatment .........18

                        v.       Social Distancing ............................................19

                        vi.      Training ..........................................................19

III.    TEMPORARY RESTRAINING ORDER STANDARD. ...................20

IV.     THIS COURT SHOULD ORDER KYDYRALI'S IMMEDIATE RELEASE. ......21

        A.      Kydyrali is Likely to Succeed on His Petition's Merits ................21

        B.      He is Likely to Suffer Irreparable Harm Absent the Temporary
                Restraining Order .................................................................22

        C.      The Public Interest and Balance of Equities Weigh Heavily in
                Kydyrali's Favor ..................................................................24

V.      CONCLUSION .................................................................................25

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Helling v. McKinney*, 509 U.S. 25 (1993)...................................................................22

*Nken v. Holder*, 556 U.S. 418 (2009)......................................................................20

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)...............................23

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)..........................................................20, 21

**Federal Court of Appeals Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................20, 22

*Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)........................................22

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) ............................20

*Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018)......................................22

*Hernanez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ................................................23

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006)......................................22

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) (per curiam)..................................24

*Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012)..................................................20

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)................................................24

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) .............20

*Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (per curiam)
(unpublished order)..............................................................................2, 23

**Federal District Court Cases**

*Banda v. McAleenan*, 385 F. Supp. 3d 1099 (W.D. Wash. 2019) ..................................21

*Basank et al. v. Decker et al.*, No. 1:20-cv-02518-AT (S.D.N.Y.
Mar. 26, 2020)....................................................................................2, 5, 6, 25

*Bravo Castillo et al. v. Barr et al.*, No. 5:20-cv-00605-TJH-AFM (C.D. Cal.
Mar. 27, 2020)..............................................................................2, 22, 23, 24

*Curtis Valentine et al. v. Collier et al.*, No. 4:20-cv-1115 (S.D. Tex.
Apr. 16, 2020) ..........................................................................................11

*Firas Djelassi v. ICE Field Office Dir.*, 2020 U.S. Dist. LEXIS 8751 (W.D. Wash.
Jan. 17, 2020)..........................................................................................21

*Fraihat v. U.S. Imm. and Customs Enforcement*, No. 5:19-cv-1546-JGB-SHK
(C.D. Cal. filed Aug. 19, 2019)....................................................................5

*Jamal A. v. Whitaker*, 358 F. Supp. 3d 853 (D. Minn. 2019)...............................................21

**Federal Statutes**

8 U.S.C. § 1225(b), INA § 235(b).................................................................................21

## I.     INTRODUCTION.

This Court heard Petitioner Satbay Kydyrali's first temporary restraining order request on Wednesday, April 8, 2020. Following the parties' arguments, it denied the request "for now," concluding that the government's evidence demonstrated it was taking reasonable steps to isolate and protect detainees at the Otay Mesa Detention Center (OMDC). It also determined that Kydyrali's exposure to pandemic coronavirus disease (COVID-19) militated against his release, particularly because—in this Court's estimation—OMDC was equipped to handle it.

But as discussed *infra* (at 13-20) and demonstrated in the attached exhibits— including attorney declarations, newspaper articles, and public officials' statements on OMDC's conditions (*see* Exs. K, N-X)—Immigration and Customs Enforcement (ICE) Health Service Corps' (IHSC) Deputy Medical Director, Philip Farabaugh's declaration[1] (ECF No. 9 at 2-6 ("Farabaugh Decl.")) did not accurately reflect conditions at OMDC. And those conditions are now deteriorating.

Simply put, CoreCivic, Inc., is not providing detainees all the sanitation supplies Farabaugh described. *See infra* at 13-15. Nor are Respondents otherwise complying with the Center for Disease Control and Prevention's (CDC) guidelines. *See infra* at 15-20.

Indeed, the declarants state uniformly that CoreCivic is not providing hand sanitizer (*see infra* at 13-14), and its employees are not performing cleaning services (*see infra* at 14-15). They further state that CoreCivic is not providing personal protective

---

[1] Somewhat curiously, the government filed an unsigned copy of Farabaugh's declaration (ECF No. 9 at 6), notwithstanding that it did so as a supplement to allow it additional time to secure the "final, signed copy." Mot. Resp. at 4 n.1. In a later, signed version of that declaration, submitted in two other cases, Farabaugh removed language from paragraph 2 stating that he directs the medical care at OMDC. *Compare* ECF No. 9 at 2 ("I provide oversight *and direction* of the *medical care to individuals being held in the custody of ICE, to include the* Medical Facility at the Otay Mesa Detention Center (OMDC)") (emphasis added) *with Habibi v. Barr, No.* 3:20-cv-00618-BAS-RBB (S.D. Cal. Apr. 10, 2020), ECF No. 11-2 at 3 ("I provide oversight of the Medical Facility at Otay Mesa Detention Center (OMDC)."); *Sagastume et al. v. Archambeault et al.*, No. 3:20-cv-00658-LAB-MSB (S.D. Cal. Apr. 12, 2020), ECF No. 24-2 at 2 (same).

equipment (PPE) to all detainees. *See infra* at 15-17.

Significantly, two declarants state and The San Diego Union-Tribune reported that, on April 10, 2020, CoreCivic offered detainees protective gear conditioned on their waiving that company's liability, and threatened to use pepper spray for noncompliance, relenting only after protests and adverse publicity. *See infra* at 16-17. The declarants also report problems with screening, quarantining, and treatment (*see infra* at 18-19); social distancing (*see infra* at 19); and training (*see infra* at 19-20). This evidence demonstrates that Respondents are not taking reasonable steps to protect their civil detainees' health and safety.

As Kydryali discussed in his first motion, the United States Court of Appeals for the Ninth Circuit and district judges throughout the country have ordered the government to release civil detainees because of the COVID-19 threat they face. *See, e.g.*, *Xochihua-Jaimes v. Barr*, No. 18-71460, slip op. at 1 (9th Cir. Mar. 24, 2020) (per curiam) (unpublished order) (attached as Ex. F); *Basank et al. v. Decker et al.*, No. 1:20-cv-02518-AT, slip op. at 12 (S.D.N.Y. Mar. 26, 2020) (attached as Ex. G); *Bravo Castillo et al. v. Barr et al.*, No. 5:20-cv-00605-TJH-AFM (C.D. Cal. Mar. 27, 2020) (attached as Ex. H).

Consequently, Kydryali—who is particularly vulnerable to severe COVID-19 infection because of his history of tuberculosis, bronchitis, and pneumonia (*see* Ex. B, 2017 Medical Records; Ex. C, 2005 Medical Records; Ex. E, Declaration of Bakhit Irgebayeva at 1 ("Irgebayeva Decl."); Ex. K, Declaration of Joshua A. Altman ¶ 20 ("Altman Decl.")[2]—urges this Court to order his release during his habeas petition's pendency to avert irreparable harm.

---

[2] Kydryali changed his name legally in July 2017 from Almat Rysbekovich Irgebayev to Satbay Kydyral. *See* Ex. D, Name Change Certificate. The 2005 and 2017 medical records attached as Exhibits B and C identify him as Irgebayev.

## II.   FACTUAL BACKGROUND.

### A.   <u>Kydyrali's Prolonged Detention</u>

Kydyrali is a thirty-one-year-old native and citizen of Kazakhstan. Am. Pet. ¶ 17. He applied for admission into the United States on July 5, 2018. Am. Pet. ¶ 18. United States Customs and Border Protection officers detained him, and referred him to United States Citizenship and Immigration Services (USCIS) for a credible fear interview with an asylum officer. *Id*. The asylum officer determined that he has a credible fear of persecution or torture in Kazakhstan. *Id*. USCIS then issued and filed a notice to appear, initiating removal proceedings. *Id*.

On August 21, 2018, ICE granted Kydyrali parole, conditioned on his paying a $10,000 bond. Am. Pet. ¶ 19. In so doing, it determined that he did not pose a flight or safety risk. *Id*. But ICE rescinded its parole decision—before Kydyrali could pay the bail—because of Kazakhstani authorities' issuing Kydyrali an Interpol Red Notice. *Id*. Kazakhstani authorities later withdrew that Red Notice, as ICE's trial attorneys acknowledged in the removal proceedings. Am. Pet. ¶ 20.

Kydyrali filed a petition for review and motion for stay of removal in the Ninth Circuit on October 10 and 15, 2019, respectively. Am. Pet. ¶ 21. Upon filing the stay motion, the court granted a temporary stay of removal automatically. *Id*. On December 6, 2019, the court ordered that the temporary stay would continue while it adjudicates his petition for review. *Id*.

Notwithstanding that ICE rescinded its parole decision because of the Red Notice, and Kazakhstani authorities withdrew it—and indeed, have since dismissed all criminal charges against him—ICE nonetheless refused to release him. Am. Pet. ¶ 22. He again requested parole in October or November 2019. *Id*. But an ICE officer orally communicated ICE's denying that request in December 2019. *Id*.

On November 15, 2019, an immigration judge denied Kydyrali's bond hearing request. Am. Pet. ¶ 23. She acknowledged that Kydyrali had been "subjected to

prolonged detention." *Id*. But she determined that she lacked "jurisdiction to hold a civil detention hearing . . . ." *Id*. That immigration judge also denied Kydyrali's motion to reconsider on January 15, 2020, concluding that he did not allege materially changed circumstances. Am. Pet. ¶ 24.

The following month, on February 21, 2020, Kydyrali again requested that ICE parole him, highlighting that he is not a flight risk and does not pose a danger to the community, is willing to pay a bond, and has a sponsor willing to house and support him while the Ninth Circuit considers his petition for review. Am. Pet. ¶ 25. But ICE denied his parole request on March 6, 2020. *Id*.

Kydyrali filed a fourth parole request on April 3, 2020,[3] supported by evidence of his history to respiratory illness and risk of severe COVID-19 infection. *See* Ex. L. On April 13, 2020, Kydyrali's deportation officer responded that, because Kydyrali was "subject to mandatory detention pursuant to [8 U.S.C. § 1231(a)(2),] INA § 241(a)(2)," he "would continue to be detained . . . ." *Id*. After counsel explained why Kydyrali is not detained under § 1231(a)(2),[4] which only applies "[d]uring the removal period," as defined in 8 U.S.C. § 1231(a)(1)(B), INA § 241(a)(1)(B), the officer stated only that he would "bring [counsel's] concern for [Kydyrali]'s high risk medical history up to [ICE] medical staff and management." *Id*. To date, he has not provided any additional information on Kydyrali's parole request.

Thus, Respondents have detained Kydyrali for over twenty-one months without

---

[3] Kydyrali filed that request the same day he first moved this Court for a temporary restraining order.

[4] If Kydyrali were detained under 8 U.S.C. § 1231(a)(6), INA § 241(a)(6), in the post-removal period, he would be eligible for an individualized bond hearing before an immigration judge based on his prolonged detention. *See Aleman Gonzalez v. Barr*, No. 18-16465, slip op. at 59 (9th Cir. Apr. 7, 2020). But because the Ninth Circuit stayed Kydyrali's removal on October 15, 2019, the removal period has not begun (*see* 8 U.S.C. § 1231(a)(1)(B), INA § 241(a)(1)(B)).

providing him with an individualized bail hearing before a neutral adjudicator.

**B.**   **COVID-19 Dangers at OMDC**

**1.**   **COVID-19 Dangers in Detention Facilities**

According to Dr. Homer D. Venters and Dr. Carlos Franco-Paredes,[5] COVID-19 is a viral pandemic for which there is no established curative medical treatment and no vaccine. *See* Ex. I, Declaration of Dr. Homer D. Venters ¶ 5 ("Venters Decl."). Its infection rates are growing exponentially in the United States. *See id*. ¶ 6.

As of April 23, 2020, at least 2,658,387 people worldwide have confirmed COVID-19 diagnoses, including 842,624 in the United States. And at least 185,434 people worldwide have died from that disease, including 46,851 in the United States.[6]

COVID-19 is creating dangerous conditions in detention facilities. The CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities states that risks are heightened in detention facilities, which "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. *See* ECF No. 8 at 36. As the CDC observed, detention facilities' "congregate environments" and many opportunities for COVID-19's introduction heighten the risks of its introduction and spreading there. *Id*. And it notes that many facilities' conditions—including limited onsite healthcare services, limited medical isolation/quarantine space, and detained persons' inability to exercise disease prevention measures, e.g., frequent handwashing and social distancing—further heighten those risks. *Id*.

---

[5] The plaintiffs in *Fraihat v. U.S. Imm. and Customs Enforcement* submitted Dr. Venters's and Dr. Franco-Paredes's declarations in that ongoing litigation. No. 5:19-cv-1546-JGB-SHK (C.D. Cal. Mar. 24, 2020), ECF Nos. 81-11 & 81-12. And District Judge Analisa Torres relied on them in ordering Basank's release. *See Basank*, slip op. at 14-15.

[6] Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://coronavirus.jhu.edu/map.html (last visited Apr. 23, 2020).

As a district judge in the Southern District of New York recently noted, "[t]he risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious." *Basank*, slip op. at 12. Indeed, Dr. Venters opines that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19." Venters Decl. ¶ 12. Dr. Fraco-Paredes states that "[i]mmigration detention centers in the U.S. are tinderboxes for the transmission of highly transmissible infectious pathogens including the SARS-CoV-2, which causes COVID-19. Given the large population density of immigration detention centers and the ease of transmission of this viral pathogen, the attack rate inside these centers will take exponential proportions, consuming significant medical and financial resources." Ex. J, Declaration of Dr. Carlos Franco-Paredes at 3 ("Fraco-Paredes Decl.").

Kydyrali is particularly vulnerable to respiratory illness. He contracted tuberculosis as a child and has suffered from respiratory issues throughout his life. *See* Irgebayeva Decl. at 1; Altman Decl. ¶ 20. In 2005, he was diagnosed with pneumonia. *See* Ex. B. And in 2017, he was diagnosed with acute bronchitis and chronic bronchopneumonia. *See* Ex. C.

As Dr. Franco-Paredes states in his declaration, "[f]or people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent." Franco-Paredes Decl. at 4. That population includes those with "Chronic Respiratory Disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases)." *Id*. at 5.

And as Dr. Venters characterizes, ICE is ill-equipped to provide adequate protections for those highest-risk populations. *See* Venters Decl. ¶¶ 14-22. He describes ICE's protocols as "grossly deficient." *Id*. ¶ 14. Those protocols focus on asking questions instead of checking active symptoms, fail to include basic infection control measures like access to hand sanitizer and use of masks, lack guidance on handling surge capacity and when to conduct testing, state that only those with suspected contact will be

monitored for fourteen days, and provide no guidance about identifying high-risk patients and special precautions. *Id*. ¶¶ 14(a)-(f).

Further, Dr. Venters states that ICE lacks guidance on testing, treatment, and hospital transfers. Venters Decl. ¶ 15. ICE's reliance on "isolation rooms" requires that empty housing areas be available, but this will be impossible in those facilities that are over 80% capacity. *Id*. ¶ 16. Isolation units often cause new health problems and drive increased physical interaction between staff and patients. *Id*. ¶ 17. And transferring large numbers of detained people between facilities will increase COVID-19's spread. *Id*. ¶ 18. Additionally, he predicts that as the number of infections in ICE facilities rises, fewer health and security staff will be available, impacting basic operations. *Id.* ¶ 19.

Finally, Dr. Venters states that based on his interviews with detainees, "ICE is not following even the most basic infection control policies that they report as their standard of care . . . ." Venters Decl. ¶ 20. This includes ICE's failing to provide handwashing supplies, check symptoms, stop detainee transfers, screen staff, ask about risk factors, establish standards on the use of gloves and masks, provide patients education, enact social distancing, and communicate regarding patients' COVID-19 status inside quarantined areas. *Id*. ¶¶ 20(a)-(j).

Instead, the experts agree that the government must "dilute the potential community-based impact of an outbreak inside immigration detention centers." Franco-Paredes Decl. at 7-8. Dr. Franco-Paredes concludes as follows:

> Therefore, it is my professional view that releasing detainees/asylum seekers on humanitarian parole from these centers constitutes a high-yield public health intervention that may significantly lessen the impact of this outbreak not only within detention centers but among the communities surrounding these centers. In particular, targeting the release of persons in the age groups at risk of severe disease and death; and persons with underlying medical conditions, may lessen the human and financial costs that this outbreak may eventually impose on ICE detention facilities nationwide. Responding to an outbreak requires significant improvements in staffing, upgrading medical equipment, substantial supplies including antibiotics, intravenous infusions, cardiac and respiratory monitors, devices for oxygen supply, and personal protection supplies among persons at high risk of severe COVID-19 disease.

*Id.* at 8. Dr. Venters similarly concludes as follows:

> ICE must release all people with risk factors to prevent their serious illness and/or death. The ICE response makes clear that they do not plan to establish special protections of high-risk patients and will wait for them to become symptomatic. This approach will result in preventable morbidity and mortality. Both the oversight authority of the NYC jail system and the current medical director for geriatrics and complex care have called for high risk patients to be immediately transferred out of detention. ICE faces a completely preventable disaster by keeping high risk patients in detention as COVID-19 arrived in facilities where the virus will quickly spread. The basic limitation of the physical plant and looming staffing concerns make clear that these patients are in peril of serious illness or death if they remain in detention. In addition, transfer of these patients to other ICE detention facilities will only compound exposure and transmission of COVID-19. They must be released immediately.

Venters Decl. ¶ 23.

And yet, in testimony to the House Committee on Oversight and Reform on April 17, 2020, Respondent Matthew T. Albence testified that ICE had "completed" its "review of [the] existing population," released fewer than 700 vulnerable persons, and did not plan to release any other detainees to slow COVID-19's spread.[7]

## 2.   <u>Minimum Steps Necessary to Protect Civil Detainees from COVID-19</u>

The CDC's Interim Guidance provides protocols for detention facilities' operational preparedness, prevention, and management of COVID-19.

Regarding preparedness, it states, *inter alia*, that those facilities should "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, [personal protective equipment] (PPE), and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available . . . ." ECF No. 8 at 41. Those stocks should include

---

[7] Press Release, House Committee on Oversight and Reform, DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus (Apr. 17, 2020), available at https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees (attached as Ex. Y).

"[l]iquid soap," "[a]lcohol-based hand sanitizer containing at least 60% alcohol," "[c]leaning supplies" that are "effective against the virus," and "[r]ecommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls)." *Id.* at 41-42.

As for prevention, it details cleaning and disinfecting practices to include "clean[ing] and disinfect[ing] surfaces and objects that are frequently touched, especially in common areas" several times per day, and "increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day." ECF No. 8 at 43. It further details hygiene practices to include "provid[ing] and continually restock[ing] hygiene supplies throughout the facility" and "[p]rovid[ing] alcohol-based hand sanitizer with at least 60% alcohol . . . ." ECF No. 8 at 44. And it details "social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)" for common areas, recreation, meals, group activities, housing, and medical services. *Id.* at 45.

Finally, regarding management, it details, *inter alia*, protocols for medical isolation of confirmed or suspected COVID-19 cases, including criteria for ending individuals' medical isolation; cleaning spaces where COVID-19 cases spent time; quarantining close contacts of COVID-19 cases; and managing those with COVID-19 symptoms. ECF No. 8 at 49-56. In particular, for close contacts, it provides that "[f]acilities should make every possible effort to quarantine close contacts of COVID-19 cases individually," and that, if cohorting is necessary, those who are a higher risk of severe illness should not be so treated. Further, cohorted "individuals with symptoms of COVID-19 should be placed under medical isolation," housed according to a specified preference order, "should wear face masks at all times," and be checked for symptoms—including temperature checks— twice a day. *Id.* at 53-55.

Quite instructively, considering the CDC's guidelines, a district judge in the United

States District Court for the Southern District of Texas recently ordered Texas officials to implement the following measures to protect inmates at the Texas Department of Criminal Justice's (TDCJ) Wallace Pack Unit from transmission of COVID-19:

- Provide Plaintiffs and the class members with unrestricted access to hand soap and disposable hand towels to facilitate handwashing.
- Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol in the housing areas, cafeteria, clinic, commissary line, pill line, and laundry exchange.
- Provide Plaintiffs and the class members with access to tissues, or if they are not available, additional toilet paper above their normal allotment.
- Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning, including in quantities sufficient for each inmate to clean and disinfect the floor and all surfaces of his own housing cubicle, and provide new gloves and masks for each inmate during each time they are cleaning or performing janitorial services.
- Provide all inmates and staff members with masks. If TDCJ chooses to provide inmates with cotton masks, such masks must be laundered regularly.
- Require common surfaces in housing areas, bathrooms, and the dining hall to be cleaned every thirty minutes from 7 a.m. to 10 p.m. with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures.
- Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment.
- Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic. In the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available.
- Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody.
- For transportation necessary for prisoners to receive medical treatment or be released, CDC-recommended social distancing requirements should be strictly enforced in TDCJ buses and vans.
- Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) information on how inmates can protect themselves from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area and above every sink.
- Educate inmates on the COVID-19 pandemic by providing information about the COVID-19 pandemic, COVID-19 symptoms, COVID-19 transmission, and how to protect oneself from COVID-19. A TDCJ staff person must give an oral

1    presentation or show an educational video with the above-listed
2    information to all inmates, and give all inmates an opportunity to
     ask questions. Inmates should be provided physical handouts
3    containing COVID-19 educational information, such as the
     CDC's "Share Facts About COVID-19" fact sheet already in
     TDCJ's possession.

4    • TDCJ must also orally inform all inmates that co-pays for
5      medical treatment are suspended for the duration of the
       pandemic, and encourage all inmates to seek treatment if they are
6      feeling ill.

     • TDCJ must, within three (3) days, provide the Plaintiffs and the
7      Court with a detailed plan to test all Pack Unit inmates for
8      COVID-19, prioritizing those who are members of Dorm A and
       of vulnerable populations that are the most at-risk for serious
9      illness or death from exposure to COVID-19. For any inmates
       who test positive, TDCJ shall provide a plan to quarantine them
10     while minimizing their exposure to inmates who test negative.
       TDCJ must also provide a plan for testing all staff who will
11     continue to enter the Pack Unit, and for any staff that test
       positive, provide a plan for minimizing inmates' exposure to staff
       who have tested positive.

12   *Curtis Valentine et al. v. Collier et al.*, No. 4:20-cv-1115, slip op. at 2-4 (S.D. Tex.

13   Apr. 16, 2020) (attached as Ex. M).

14        Similarly, on April 13, 2020, California Attorney General Xavier Becerra sent a

15   letter to Respondent Chad F. Wolf, urging that he "take critical steps to minimize the

16   transmission of COVID-19 in immigration detention facilities."[8] He noted that

17   Respondent Wolf's "[f]ailure to use [his] discretion to decrease the detainee population as

18   much as possible and improve sanitation and COVID-19 screening practices for those

19   detainees that remain will not only harm civil immigration detainees, but will overwhelm

20   community hospitals to which those detainees will necessarily be transferred for

21   treatment."[9] And he urged that Respondent Wolf take the following immediate steps:

22   • Limit the transfer or transport of detainees and halt the
23     introduction of new detainees to immigration detention
       facilities, requiring a 14-day quarantine for any detainee for
24     whom transfer or admission is unavoidable;

25        [8] Letter from Xavier Becerra, Attorney General, State of California, to Chad F.
26   Wolf, Acting Secretary of Homeland Security, Department of Homeland Security (Apr.
     13, 2020) (attached as Ex. N).

27        [9] *Id.*
28

- Obtain COVID-19 test kits and conduct comprehensive testing of staff and the detained population to avoid transmission, using temperature and other vital statistics screens while waiting for such tests to become available;
- Obtain protective equipment such as masks, gloves, soap, and cleaning products for detainees and staff, and educate detainees and staff about how to minimize transmission, taking care to ensure that language minorities also receive this vital information;
- Identify and release detainees that pose no risk to public safety, such as those without significant criminal histories or pending criminal charges, prioritizing those that are in fragile health, so as to reduce the risk in detention facilities in a manner that balances any public safety concerns associated with such releases; and
- Increase sanitation, availability of cleaning supplies and sanitizer, alter schedules, meal delivery, and physical space in detention facilities for remaining detainees while taking care not to further curtail detainees' liberty within the facilities.[10]

### 3. COVID-19 Cases at OMDC

On March 31, 2020, The San Diego Union-Tribune reported that "[a]n employee at Otay Mesa Detention Center tested positive for COVID-19 after showing symptoms"; "the sick employee worked primarily with ICE detainees"; "[o]ne 'pod'—or detention unit—of ICE detainees has been quarantined"; and "judges for the facility's immigration court were told to evacuate mid-afternoon [that day]."[11]

In his first declaration, Farabaugh stated that as of 11:00 a.m. on April 6, 2020, there were six suspected cases of COVID-19 infection in ICE detainees in OMDC's medical housing unit;[12] eight confirmed cases of COVID-19 at OMDC, with all eight housed in the medical housing unit; and one detainee had been admitted to Alvarado

---

[10] *Id.*

[11] Kate Morrissey & Andrea Lopez-Villafaña, Employee at Otay Mesa Detention Center tests positive for COVID-19, The San Diego Union-Tribune (Mar. 31, 2020), available at https://www.sandiegouniontribune.com/news/immigration/story/2020-03-31/employee-at-otay-mesa-detention-center-being-tested-for-covid-19-after-showing-symptoms (attached as Ex. A).

[12] Farabaugh did not specify a total number of suspected cases of COVID-19 at OMDC, only how many ICE detainee cases were in the medical housing unit.

Hospital. Farabaugh Decl. ¶¶ 12(a), (c). He further stated that Kydyrali had been exposed to a detainee that tested positive for COVID-19 and Kydyrali—along with all detainees in his housing unit—had been cohorted, and that their quarantine would remain in effect until the fourteen-day incubation period completed. *Id.* ¶ 12(b).

Within his second declaration, submitted in *Habibi* and *Sagastume*, Farabaugh stated that, as of 10:00 a.m. on April 9, 2020, there were five suspected cases of COVID-19 infection in ICE detainees in OMDC's medical housing unit and fourteen confirmed cases of COVID-19 infection at OMDC. *Habibi, No.* 3:20-cv-00618-BAS-RBB, ECF No. 11-2 at 4; *Sagastume*, No. 3:20-cv-00658-LAB-MSB, ECF No. 24-2 at 3.

On April 14, 2020, KPBS reported that there were nineteen detainees with confirmed cases of COVID-19 at OMDC, fifteen of whom were immigration detainees, and that eight staff members had also tested positive.[13] The following day, The San Diego Union Tribune reported that OMDC had become the "immigration detention facility with the highest number of confirmed COVID-19 cases."[14]

As of April 22, 2020, Immigration and Customs Enforcement reports that 42 of its 287 confirmed cases are at OMDC. ICE Guidance on COVID-19, https://www.ice.gov/coronavirus#tab1 (last visited Apr. 23, 2020).

### 4. <u>Conditions at OMDC</u>

#### i. **Hand Sanitizer Availability**

Kydyrali maintains that OMDC does not provide hand sanitizer with alcohol.

---

[13] Max Rivlin-Nadler, Otay Mesa COVID-19 Outbreak Now The Largest At A US Immigration Detention Center, KPBS (Apr. 14, 2020), available at https://www.kpbs.org/news/2020/apr/14/otay-mesa-detention-center-now-largest-immigration (attached as Ex. O).

[14] Kate Morrissey, Otay Mesa immigration courts closed, hearings postponed as detention facility COVID-19 cases grow, The San Diego Union-Tribune (Apr. 15, 2020), available at https://www.sandiegouniontribune.com/news/immigration/story/2020-04-15/otay-mesa-immigration-courts-closed-hearings-postponed-as-detention-facility-covid-19-cases-grow (attached as Ex. P).

Altman Decl. ¶ 8. On approximately March 31, 2020, when the detainees in his pod first learned of the outbreak, they asked the officers for hand sanitizer. *Id*. But the officers refused, saying they do not have any. *Id*. The detainees also asked about purchasing hand sanitizer. *Id*. But the officers told them there was no such product available. *Id*.

Instead, he maintains, OMDC provides only foam soap for handwashing. Altman Decl. ¶ 8. But the sinks cannot be turned on for twenty seconds at a time. *Id*. ¶ 9. They do so for only five or ten seconds. *Id*.

Attorney Joshua Jones avers that the Federal Defenders' clients contend that they do not have hand sanitizer and the commissary does not sell hand sanitizer. Ex. Q, Declaration of Joshua Jones ¶ 22 ("Jones Decl.").

Additionally, Attorney Anna Hysell avers that her client in Pod A confirmed that there is no hand sanitizer available in her unit. Ex. R, Declaration of Anna Hysell ¶ 14 ("Hysell Decl."). Further, Attorney Kirsten Zittlau avers that her client in Pod J described having no hand sanitizer. Ex. S, Declaration of Kirsten Zittlau ¶ 4 ("Zittlau Decl."). Also, Attorney Ian M. Seruelo attests that his client in Pod A maintains that the "facility does not provide hand sanitizers." Ex. T, Declaration of Ian M. Seruelo ¶ 7 ("Seruelo Decl."). And Attorney Cassandra Borjon avers that, on April 8, 2020, a client's family members reported to her that "ICE was not providing any protection, such as hand sanitizers, gloves or masks." Ex. U, Declaration of Cassandra Borjon ¶ 3 ("Borjon Decl.").

### ii.   Cleaning Supplies, Crews, and Schedule

Kydyrali contends that no CoreCivic, Inc., or ICE employees clean the bathrooms or showers. Altman Decl. ¶ 5. Instead, detainee-staffed crews clean approximately three times per day. *Id*. ¶ 6. This is the same amount of work they did before the COVID-19 outbreak. *Id*. The detainees' cleaning is of low quality. *Id*. Indeed, everything remains dirty. *Id*.

He further describes how OMDC provides disinfectant, towels, and gloves to the detainees who are cleaning. Altman Decl. ¶ 7. The disinfectant appears to be the same

substance OMDC furnished before the COVID-19 outbreak. *Id*. And OMDC is providing the same amount. *Id*.

Attorney Jones avers that the Federal Defenders' clients reported that OMDC relies on volunteer-based cleaning. Jones Decl. ¶ 22. The cleanings' frequency depends on which officer is in charge, with some ordering it once every hour. *Id*. ¶ 25. Detainees share diluted cleaning solution, brushes, and sponges. *Id*. ¶ 23. Showers were washed once to twice a day, and pressure washed once a week. *Id*. ¶ 24.

But the clients did not know if the showers were sanitized with chemical cleaning solution. Jones Decl. ¶ 24. Clients reported cleaning public areas without masks or gloves. Jones Decl. ¶ 26. They also reported that there is no cleaning between kitchen shifts. *Id*. ¶ 15.

Moreover, Attorney Hysell avers that her client in Pod A reports that no staff cleaning crew or outside cleaning crews are cleaning the units between shifts. Hysell Decl. ¶ 16. Instead, OMDC provides her client's unit with gallons of a cleaning disinfectant, and the detainees are responsible for dispensing the disinfectant themselves into spray bottles to clean the tables in the common areas and the phones. *Id*. ¶ 15. Each cell is supposed to take turns every hour to clean the common area with the disinfectant. *Id*.

OMDC is not providing the detainees with any protective gear such as goggles or masks when using the industrial-strength disinfectant and many detainees are having health issues from it. Hysell Decl. ¶ 15. They are also not furnishing disposable gloves, and are instead reusing the same gloves as other detainees. *Id*. And the detainees are repurposing the same rags for cleaning. *Id*.

### iii.   Personal Protective Equipment

Attorney Jones avers that the Federal Defenders' clients maintained that OMDC is not providing detainees with masks. Jones Decl. ¶ 36. They reported that lunch staff did not wear them. *Id*. ¶ 15. Clients contended that guards first started wearing masks and

gloves on April 6, 2020. *Id*. ¶ 30. They also stated that the guards in the quarantined units have full PPE. *Id*. ¶ 32. One client reported that, after three women told a guard they did not feel well, one received a mask, and all were returned to the general population. *Id*. ¶ 41. Another client reported that two people who were coughing now have masks. *Id*. ¶ 42.

Additionally, Attorney Anna Hysell avers that her client in Pod A contends that, around 1 p.m. on April 10, 2020, the pod unit manager called a meeting in which she told them that she would provide each a mask "*so long as* they signed a document," which was written in English. Hysell Decl. ¶ 4-5 (emphasis in original). Then, she verbally translated the document to Spanish. *Id*. ¶ 6. But in so doing, she skipped a section. *Id*.

One detainee informed the others that the section stated that, by signing the document, they were releasing CoreCivic of responsibility regarding COVID-19 infection. Hysell Decl. ¶ 6. The officers threatened the distraught detainees with pepper spray when they demanded masks. *Id*. ¶ 9. Several detainees were then taken away and placed in confinement. *Id*. ¶ 10.

Attorney Zittlau describes one client in Pod H, who "was only very recently given a mask, and only after first being threatened with not receiving one if he did not sign a waiver releasing CoreCivic and ICE of liability if he contracts Covid-19." Zittlau Decl. ¶ 3. She avers that he "refused to sign the waiver and was ultimately given a mask (only after he said he was going to tell his lawyer)." *Id*. Attorney Zittlau additionally avers that another client, in Pod J, "also only recently received a mask, under threat of signing the above-referenced release (which my client refused to sign)." Zittlau Decl. ¶ 4.

Further, Attorney Seruelo avers that his client "reported that the facility is not giving masks and gloves to detainees. In fact she and others have tried creating makeshift mask[s] from clothing and other available materials." Seruelo Decl. ¶ 6. And Attorney Cassandra Borjon avers that, on April 8, 2020, a client's family members reported to her that "ICE was not providing any protection, such as hand sanitizers, gloves or masks."

Borjon Decl. ¶ 3.

In KPBS's April 14, 2020, reporting on the incident, CoreCivic acknowledged the contracts' existence but described the pepper-spray allegations as "patently false."[15] The San Diego Union-Tribune reported that CoreCivic staff presented both ICE and U.S. Marshals Service detainees with the English-language contracts on April 10, 2020.[16] It further reported that CoreCivic denied any use of force and stated later that day that it would not require detainees to sign contracts in exchange for masks, and one detainee confirmed that she received a mask approximately five hours later.[17]

Quite significantly, on April 15, 2020, U.S. Senators Kamala D. Harris and Dianne Feinstein and Congressman Juan Vargas sent a letter to the Department of Homeland Security's Inspector General, citing "alarming reports" of OMDC's "contractor personnel allegedly threaten[ing] the use of force and require[ing] execution of certain forms in connection with the distribution of protective equipment to detained individuals."[18] They requested that his office investigate "these allegations, related policies and procedures, and the sufficiency of those policies and procedures in protecting the health and safety of

---

[15] Rivlin-Nadler, *supra* note 12.

[16] Kate Morrissey, Sen. Kamala Harris calls for investigation into Otay Mesa Detention Center, The San Diego Union-Tribune (Apr. 15, 2020), available at https://www.sandiegouniontribune.com/news/immigration/story/2020-04-15/sen-kamala-harris-calls-for-investigation-into-otay-mesa-detention-center (attached as Ex. V).

[17] *Id.*

[18] Letter from Kamala D. Harris and Dianne Feinstein, United States Senators, and Juan Vargas, Member of Congress, to Joseph V. Cuffari, Inspector General, Department of Homeland Security (Apr. 15, 2020) (attached as Ex. W). In a separate statement, Senator Harris called the "horrifying conditions at Otay Mesa Detention Center . . . unacceptable." Kamala D. Harris, United States Senator, Harris Statement on Inhumane Conditions at Otay Mesa Detention Center (Apr. 12, 2020) (attached as Ex. X).

individuals in U.S. custody, particularly in light of the ongoing public health crisis."[19] And in so doing, they observed the office's "consistent findings . . . that ICE has failed to adequately protect the health and safety of individuals in its custody."[20]

### iv.   Screening, Quarantining, and Treatment

Kydyrali maintains that, approximately three weeks ago, someone in his pod, J.S.V., had a high temperature. Altman Decl. ¶ 14. The officers then took J.S.V. from Pod P to the medical center. *Id.* ¶ 14. J.S.V. tested positive for COVID-19 infection. *Id.* He stayed in the medical center for one week; then, they transferred him to Pod K. *Id.* The officers returned J.S.V. to Pod P during the week of April 13, 2020. *Id.* And they have taken others with high temperatures to the medical center. *Id.* The officers returned those that tested negative for COVID-19 infection. *Id.*

Further, Kydyrali maintains that, since his pod's quarantine began, the officers now measure detainees' temperatures every other day. Altman Decl. ¶¶ 13, 17. If it is high, they take that person to the medical center for one week and then to Pod K for an additional time period. *Id.*

Attorney Jones avers that the Federal Defenders' clients described seeing sick people all the time. Jones Decl. ¶ 33. They estimated higher numbers of people who have tested positive for COVID-19 as well as those awaiting test results than ICE has officially reported. *Id.* ¶ 35. Clients described observing coughing and cold- and flu-like symptoms, and that those detainees were not quarantined. *Id.* ¶¶ 37-38.

Federal Defenders' clients stated that they must place their names on a sick-call list before 5:00 a.m. to have a same-day temperature reading or check-up. Jones Decl. ¶ 28. They reported that the on-duty nurse often advises that detainees drink salt water, which they must prepare themselves. *Id.* ¶ 37. Clients maintained that kitchen workers now have temperature readings once a day. *Id.* But one client reported that OMDC staff first took

---

[19] *Id.*

[20] *Id.*

his temperature on April 5, 2020, despite his experiencing flu-like symptoms for the previous two weeks. *Id*.

Additionally, Attorney Hysell avers that her client in Pod A contended that a woman in her pod, E.S., experienced fever, body aches, and a dry cough at the beginning of the month. Hysell Decl. ¶ 17. E.S. requested a medical appointment. *Id*. But she was not seen for seven days. *Id*. Staff told her to drink warm water with salt. *Id*. Later, OMDC transferred her to the medical unit. *Id*. Attorney Hysell's client maintained that detainees can request a medical appointment only by writing their names on a list between 5:00 a.m. and 6:00 a.m. each morning. *Id*. ¶ 18.

And Attorney Zittlau states that she has a client at OMDC who has been diagnosed with pneumonia, but who has not received treatment. Zittlau Decl. ¶ 3.

### v.   Social Distancing

Kydyrali avers that officers have told the detainees in his pod that they need to keep a distance of six feet between each other. Altman Decl. ¶ 11. But he states this is not possible with eight people in a four-meter by six-meter cell. *Id*. Their four bunkbeds are arranged in the cell's corners, with a space of one meter and two meters between them. *Id*. Since the cohorting began, he is eating in his cell. *Id*. ¶ 12.

Attorney Jones avers that the Federal Defenders' clients reported there are generally two to four detainees per cell, and that the cells were either six feet by nine feet or eight feet by ten feet. Jones Decl. ¶ 10. One client maintained they are now sitting four people to a square table for meals, another indicated he ate in his unit's recreational room, and others stated they ate on their beds or on the toilets. *Id*. ¶ 13.

### vi.   Training

Kydyrali reports that someone from the medical center has come to his pod several times to provide instruction. Altman Decl. ¶ 10. That person told them only to wash their hands and keep the space clean. *Id*.

Attorney Jones avers that the Federal Defenders' clients reported that OMDC

provides information about COVID-19, but that many clients found the information insufficient. Jones Decl. ¶ 17. One client noted that all posters regarding COVID-19 were in English. *Id*. ¶ 18. Another stated that OMDC is limiting the questions that people can ask. *Id*. ¶ 19. Several clients state that the trainings focus on cleaning. *Id.* ¶ 20. Another maintained that he was never told that someone had contracted the virus, and an additional one stated that OMDC staff delayed telling them about the first positive cases for two days. *Id*.

Further, Attorney Seruelo avers that his client has "complained that there are no clear guidelines and information from the facility on what they should and should not do or about correct practices to combat the spread of the virus." Seruelo Decl. ¶ 7.

### III.   TEMPORARY RESTRAINING ORDER STANDARD.

The movant seeking a preliminary injunction or temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (discussing preliminary injunction standard); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the preliminary injunction and temporary restraining order analyses are "substantially identical"). The last two factors— equities and public interest—"merge" when the government is a party. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 2020 U.S. App. LEXIS 6620, at *40 (9th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Under the Ninth Circuit's "sliding scale" approach, the preliminary injunction and temporary restraining order tests' elements "'are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Thus, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

injunction [or temporary restraining order], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies*, 632 F.3d at 1135.

## IV.   THIS COURT SHOULD ORDER KYDYRALI'S IMMEDIATE RELEASE.

Based on the Ninth Circuit's holding in *All. for the Wild Rockies*, and the Supreme Court's opinion in *Winter*, Kydyrali merits a temporary restraining order directing his immediate release from immigration detention. Simply put, the individualized circumstances of his prolonged detention and his medical history—coupled with the dangers that COVID-19 poses to immigration detainees in Respondents' care—illustrate that he has serious questions regarding the merits, is likely to suffer irreparable injury absent this Court's ordering his release, the balance of hardships tips sharply in his favor, and an injunction is in the public interest.

### A.   <u>Kydyrali is Likely to Succeed on His Petition's Merits</u>

Simply put, Respondents have held Kydyrali under 8 U.S.C. § 1225(b), INA § 235(b), since July 2018—for twenty-one months, a prolonged period—without providing him with an individualized bail hearing before a neutral adjudicator. That violates the Fifth Amendment's Due Process Clause.

As Kydyrali discussed in his petition (*see* Am. Pet. ¶¶ 27-40), consistent with *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1106 (W.D. Wash. 2019), and *Firas Djelassi v. ICE Field Office Dir.*, 2020 U.S. Dist. LEXIS 8751, at *3-10 (W.D. Wash. Jan. 17, 2020), this Court should conclude that the six-factor balancing test in *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853 (D. Minn. 2019), demonstrates that Kydyrali's detention is unreasonably prolonged.

At least five out of six factors favor granting Kydyrali's bail hearing request, and the other factor is—at worst—neutral. Respondents have detained Kydyrali for over twenty-one months (Factor 1). The Ninth Circuit has stayed his removal during his petition for review proceedings, and his case's resolution may take another year or longer

(Factor 2). Kydyrali's detention conditions at OMDC are tantamount to penal confinement and COVID-19 is creating dangerous conditions there, particularly because of his history of tuberculosis and chronic pneumonia (Factor 3). Kydyrali has not engaged in dilatory tactics to delay his removal (Factor 4). His case's delay is a product of the BIA's and Ninth Circuit's crowded dockets (Factor 5). And as the Ninth Circuit has stayed Kydyrali's removal while it adjudicates his petition for review, the likelihood that the proceedings will culminate in a final removal order is—at worst—neutral (Factor 6).

Consequently, at a minimum, Kydyrali presents "serious questions going to the merits." *All. for the Wild Rockies*, 632 F.3d at 1135.

## B.   He is Likely to Suffer Irreparable Harm Absent the Temporary Restraining Order

At bottom, the government is violating Kydyrali's rights under the Fifth Amendment's Due Process clause by detaining him for a prolonged period without providing him with an individualized bail hearing before a neutral adjudicator, and by failing to protect him from COVID-19's dangers.

Considering COVID-19's risk to immigrant detainees at the Adelanto detention facility in Adelanto, California, a district judge in the United States District Court for the Central District of California concluded recently that "[u]nder the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at Adelanto." *Bravo Castillo*, slip op. at 9.

That judge reasoned that the government "cannot put a civil detainee into a dangerous situation, especially where that dangerous situation was created by the Government" (*Bravo Castillo*, slip op. at 6 (citing *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)), and it—at a minimum—owed petitioners a duty to "reasonably abate known risks." *Id*. at 6-7 (citing *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). Rejecting the government's contention that petitioners faced only a hypothetical risk, the judge determined that, under *Helling v. McKinney*, 509 U.S. 25 (1993), the

government "cannot be deliberately indifferent to the potential exposure of civil detainees to a serious, communicable disease on the ground that the complaining detainee shows no serious current symptoms, or ignore a condition of confinement that is more than very likely to cause a serious illness." *Bravo Castillo*, slip op. at 9 (citing *Helling*, 509 U.S. at 32).

That judge concluded that "[c]ivil detainees must be protected by the Government" and yet, "[p]etitioners ha[d] not been protected." *Bravo Castillo*, slip op. at 10. Rather, the government was not keeping them "at least 6 feet apart from others at all times"; was "forc[ing] [them] to touch surfaces touched by other detainees, such as with common sinks, toilets and showers"; and was exposing them to a "particularly high [risk] if an asymptomatic guard, or other employee, enters a facility." *Id.*

Here, the evidence that Kydyrali proffers—attorney declarations, newspaper articles, and public officials' statements on OMDC's conditions (*see* Exs. Exs. K, N-X)—demonstrate that Respondents are not taking reasonably available measures to protect the civil detainees in their care. *See, e.g.*, *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

For instance, they are not taking the minimum steps necessary to protect civil detainees from COVID-19. Kydyrali's proffered evidence reflects that Respondents are not providing hand sanitizer or even sinks that can remain on for twenty seconds at a time; professional cleaning crews, much less on a sufficient schedule; PPE for all detainees, even in cohorting units; sufficient screening practices, including twice-daily temperature checks; quarantines consistent with the CDC's guidelines; sufficient opportunities for social distancing; or adequate training. And they are not taking additional steps to protect Kydyrali, who has a higher risk of severe COVID-19 infection, notwithstanding the CDC's guidelines. *See supra* at 8-12.

Moreover, Respondents' failure to follow the CDC's Interim Guidance also contravenes *Accardi* principles. *See United States ex rel. Accardi v. Shaughnessy*, 347

U.S. 260, 266-68 (1954) (holding that the government is bound by its own regulations). This is so because ICE has an obligation under paragraph 10 of its own 2011 Performance-Based National Detention Standards on Medical Care, which provides that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."[21]

Consequently, this Court should conclude that "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Bravo Castillo*, slip op. at 10 (citing *Hernanez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017)).

And Kydyrali's injury goes beyond the constitutional violation. As the Ninth Circuit concluded, COVID-19 presents a "rapidly escalating public health crisis, which public health authorities predict will impact immigration detention centers . . . ." *Xochihua-Jaimes*, slip op. at 1. Moreover, COVID-19 is spreading at OMDC, where Respondents are holding Kydyrali, and Kydyrali's history of tuberculosis and chronic pneumonia (*see* Exs. B, C, E, K) makes him particularly vulnerable to COVID-19 (*see supra* at 6-7). Simply put, he faces an imminent risk of serious injury or death if he remains in ICE custody.

C.   **The Public Interest and Balance of Equities Weigh Heavily in Kydyrali's Favor**

Finally, the public interest and balance of hardships tip sharply in Kydyrali's favor. As Kydyrali demonstrated while discussing the irreparable harm he would sustain if the Court denies his motion, there is a significant chance that this Court's denying his motion would result in harm to his constitutional rights and his health.

Moreover, Respondents' potential harm is limited. Although the government, as the Ninth Circuit noted in *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (per curiam), generally has an interest "in prompt execution of removal orders," because the Ninth Circuit has stayed Kydyrali's removal while it considers his petition for review, the

---

[21] 2011 Operations Manual ICE Performance-Based National Detention Standards § 4.3 (revised 2016), *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

government cannot remove him at this time. Consequently, this Court's ordering his release from detention will not prejudice the government.

Rather, this Court should determine that ordering Kydyrali's release will remedy the government's twin constitutional violations—detaining him for a prolonged period without providing him with an individualized bail hearing before a neutral adjudicator and failing to protect him from COVID-19's dangers. And it should conclude, as in *Bravo Castillo*, "there is no harm to the Government when a court prevents the Government from engaging in unlawful practices." *Bravo Castillo*, slip op. at 10 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

To the extent Kydyrali was subject to a quarantine based on a close contact with a COVID-19 case when this Court heard his first temporary restraining order request, Respondents have now had an opportunity to screen and quarantine him properly. Any failure to do so adequately—resulting in a quarantine period of more the already-elapsed fourteen days—should not further redound to Kydyrali's detriment.

Finally, as discussed *supra* (at 7-8), as the district judge in *Basank* concluded, this Court should determine that the public interest favors Kydyrali's release because "in the highly unusual circumstances posed by the COVID-19 crisis," "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." *Basank*, slip op. at 14-15.

## V.   CONCLUSION.

This Court should grant Kydyrali's motion for a temporary restraining order and order Respondents to release him immediately.

Dated: April 23, 2020

JACOBS & SCHLESINGER LLP

By: /s/ Joshua A. Altman
Joshua A. Altman

Attorney for Petitioner
E-mail: josh@jsslegal.com